**Philip REBENSTOCK, on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**DELOITTE & TOUCHE, Defendant.**

**No. 94–CV–71331–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 25, 1995.

Elwood S. Simon, John P. Zuccarini, Birmingham, MI, Bruce E. Gerstein, New York City, Lawrence A. Sucharow, New York City, Daniel C. Girard, San Francisco, CA, Robert S. Schachter, New York City, for plaintiffs.

Lawrence G. Campbell, Mary Beth Kelly, Detroit, MI, for defendant.

## OPINION

DUGGAN, District Judge.

Before this Court are defendant's motion for summary judgment and plaintiff's[1] motion for partial summary judgment. The Court heard oral argument on these motions on August 18, 1995. Defendant ("Deloitte") maintains that it is entitled to summary judgment because (1) plaintiff's securities fraud claims are barred by the applicable statute of limitations, *Lampf, Pleva, Lipkind, Prupis & Petigro v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and (2) the alleged misrepresentations made by Deloitte in the accounting sections of the prospectus and registration statement did not cause plaintiff's stock to lose value.

Plaintiff contends that he is entitled to summary judgment with respect to the § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, claim against Deloitte.[2] Plaintiff contends that Deloitte consented to the inclusion in the prospectus of its unqualified 1991 audit opinion, despite the fact that Deloitte knew, or but for its negligence should have known, that (1) the prospectus' financial statements contravened generally accepted accounting principles (GAAP) and (2) violated generally accepted auditing standards (GAAS).

### *I. Background*

Fruehauf Trailer Corporation (Fruehauf) sold 4 million shares of its common stock at an initial public offering (IPO) on June 28, 1991, at a price of $11 per share. Plaintiff purchased in the aftermarket 500 shares of Fruehauf stock at $11⅜ per share on January 6, 1992, and purchased an additional 1,000 shares at $11⅛ per share on January 16, 1992. Plaintiff sold 1,000 shares of his stock on December 7, 1992, at $5 per share. Plaintiff sold his other 500 shares on December 29, 1993, for $4⅛ per share. On December 10, 1992, after Fruehauf's common stock had declined from the IPO price of $11 to $4⅝ per share, plaintiff commenced an action against Fruehauf; Terex Corporation (Terex), Fruehauf's parent company; individual management personnel; and the Underwriters, which included Painewebber, Inc., Alex Brown & Sons, Inc., and Wertheim Schroeder & Company. Plaintiff filed a first amended complaint in the Fruehauf action on April 20, 1993. This action was filed on April 4, 1994.

Deloitte conducted an audit of Fruehauf's financial statements for the periods ending December 31, 1989 and 1990. The financial statements were included in the prospectus and registration statement filed on Form S–1 by Fruehauf with the Securities and Exchange Commission (SEC) in connection with the IPO.

The independent auditor's report provided by Deloitte with respect to Fruehauf's 1989 and 1990 financial statements was contained

---

**1.** This matter is pled as a class action. However, for purposes of this memo, the Court will refer to plaintiff in the singular, as Rebenstock is the representative for the "class."

**2.** Plaintiff also asserts a § 10(b) of the Securities Exchange Act of 1934 claim against Deloitte.

However, in order to prove a § 10(b) claim, plaintiff must show scienter. Plaintiff has chosen not to seek summary judgment on that claim, and therefore the Court will not address the claim in the context of plaintiff's motion.

in the prospectus. The auditor's report indicated that Fruehauf's 1989 and 1990 financial statements fairly presented the financial position and results of operation in all material respects in conformity with GAAP. Deloitte also prepared the 1991 auditor's report, which provided that Deloitte's audit of the financial statements was conducted in accordance with GAAS. The financial statements reflected that Fruehauf had earned profits of $994,000 in 1989 and $2,324,000 in 1990.

Fruehauf dismissed Deloitte as its independent auditor on October 13, 1992. Price Waterhouse replaced Deloitte.

In the spring of 1993, Fruehauf's new management determined that the accounting treatment of certain debt issuance costs incurred by the company should be changed. On April 30, 1993, Fruehauf's Form 10–K for 1992 was released to the public, and it disclosed that the 1989 and 1990 financial statements used in the prospectus had been restated. Note P to the Form 10–K contained the restatements, and provided in pertinent part that:

> As a result of inquiries by its current independent accountants, the Company reviewed its accounting treatment for certain prior year transactions and concluded that restatements were required to be made to the previously issued financial statements for the years ended December 31, 1990 and 1991.

Deloitte provided an independent auditors' report that was included with the 1992 10–K, which stated in pertinent part that:

> [t]hese financial statements and financial statement schedules are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the financial statements and financial statement schedules based on our audits.
>
> \*   \*   \*   \*   \*   \*
>
> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Fruehauf Trailer Corporation and subsidiaries as of December 31, 1991 . . . .
>
> As discussed in Note P to the consolidated financial statements, the Corporation has

restated its 1991 and 1990 financial statements.

The restatements revealed that Fruehauf had not earned monies, but rather suffered losses; in fact, the 1990 financial restatement showed a loss of over $2 million. Plaintiff maintains that Fruehauf's net income was overstated by $1.185 million in 1989 and $4.5 million in 1990.

Plaintiff maintains that the April 30, 1993 public disclosure was the first time that it became known to him that Deloitte also made "material" misrepresentations in the prospectus. Plaintiff filed the case against Deloitte on April 4, 1994.

In March 1995, Fruehauf's 1990 financial statements were restated again, and reflected losses in excess of $51 million.

## II. Discussion

### A. Deloitte's Motion for Summary Judgment

As noted above, Deloitte maintains that it is entitled to summary judgment because (1) plaintiff's claims are barred by the applicable statute of limitations and (2) plaintiff has failed to show causation between the drop in the value of Fruehauf's stock and Deloitte's actions.

#### 1. Statute of Limitations

The applicable limitations period for actions brought under § 11 is provided in § 13, 15 U.S.C. § 77m:

> No action shall be maintained to enforce any liability created by Section 77k [§ 11] . . . unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . . In no event shall any action be brought to enforce a liability created under section 11 . . . of this title more than three years after the security was bona fide offered to the public. . . .

The Supreme Court has adopted a similar one-year/three-year period set forth in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e), for actions brought under § 10(b):

No action shall be maintained to enforce any liability . . ., unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

*Lampf,* 501 U.S. at 364 n. 9, 111 S.Ct. at 2782 n. 9; *Freeman v. Laventhol & Horwath,* 34 F.3d 333, 337 (6th Cir.1994); *In re In–Store Advertising Sec. Litig.,* 840 F.Supp. 285, 288 (S.D.N.Y.1993).

In this case, only the one year prong of the statute of limitations applies. Defendant maintains that plaintiff had sufficient information to bring an action against it in December of 1992, and therefore, the filing of the suit on April 4, 1994, was outside the one year limitations period. Plaintiff responds that Deloitte's involvement in "misrepresenting" Fruehauf's health as a company was not publicly disclosed until April 30, 1993, and therefore, the one year period was not violated.

■ The *In–Store Advertising* court explained that:

[t]he one year prong of the statute of limitations applicable in this case runs from the time when plaintiffs had actual knowledge of the defendant's fraud, or "knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." The appropriate test for determining the moment at which this limitation period begins to run is an "objective" one, implicating inquiry notice and constructive knowledge.

This test involves a two-stage analysis. First, we must determine whether at some earlier time "the circumstances [were] such as to suggest to a person of ordinary intelligence the probability that he [had] been defrauded," thus placing plaintiffs here on inquiry notice of potential claims. . . . Second, if inquiry notice was indeed triggered, we must analyze whether plaintiffs discharged their duty to inquire through the exercise of "reasonable dili-

gence," or in contrast, have knowledge of fraud constructively imputed to them.

*In–Store Advertising,* 840 F.Supp. at 288–89 (citations omitted); *see also LaSalle v. Medco Research, Inc.,* 54 F.3d 443, 444 (7th Cir. 1995) (limitations period begins to run when a "reasonable person" would suspect the possibility of a misrepresentation or misleading omission); *Tregenza v. Great Am. Communications Co.,* 12 F.3d 717, 722 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994).

#### a. Inquiry Notice

■ Plaintiff contends that he was not placed on "inquiry notice" of the potential claims against Deloitte until April 30, 1993, when Fruehauf disclosed in its 1992 10–K that the financial statements audited by Deloitte had been restated and reflected losses rather than earnings for those periods. Plaintiff also maintains that Deloitte's "obstructionist tactics" in the Fruehauf matter, *i.e.* refusing to turn over documents with respect to Deloitte's involvement, prevented plaintiff from "reasonably" investigating the matter.[3]

Defendant contends that plaintiff was on "inquiry notice" of facts supporting a potential claim against Deloitte on December 10, 1992, when he filed his claims against the Fruehauf and Underwriter defendants. Despite the fact that it was not publicly disclosed until April 30, 1993, when Fruehauf filed its 1992 10–K that the financial statements in the prospectus were "misleading," defendant contends that plaintiff's complaint in the Fruehauf matter contained allegations that reveal "inquiry notice." In pertinent part, plaintiff's complaint against Fruehauf asserted the following:

41. . . . on or about November 15, 1991, Dow Jones newswire reported that Fruehauf and Terex had revised their accounting treatment for the second and third quarters at the request of the SEC.

\* \* \* \* \* \*

---

3. The exhibits to plaintiff's response brief include a memorandum of law in opposition to plaintiff's motion to compel compliance with subpoena filed by non-party Deloitte in the Fruehauf matter (Pl's.Resp.Br. Ex. B). Deloitte maintained,

*e.g.,* that discovery should be stayed until the defendants' motions to dismiss were decided (*Id.*). A stipulation for stay of discovery was signed by Deloitte (Pl's.Resp.Br. Ex. C).

42. Fruehauf on November 15, 1991 held out the restatement as a positive event, stating that although the $10 million revision would result in a decrease in income for the second quarter, it would also yield an increase in income for the next 12.3 years. Defendants deliberately attempted to blind the investing public to the fact that it was, as a matter of course, utilizing questionable accounting practices to keep the price of the stock inflated and prevent Fruehauf from defaulting on its loan agreements.

\* \* \* \* \* \*

48. The "house of cards" began to fold on October 13, 1992, when Fruehauf was forced to file a Form 8–K indicating that it had dismissed its auditors, Deloitte & Touche.... As was typical, the Company downplayed the significance of the dismissal, stating that it had no disagreements with Deloitte.

49. The impression that all was well at Fruehauf was eventually belied when Deloitte responded to the 8–K by means of a Form 8 filed October 26, 1992 ("Form 8"). In the Form 8, Deloitte stated:

On August 24 and 28, 1992, a representative of Deloitte & Touche discussed with the Chief Financial Officer of the Company's controlling shareholder, Terex Corporation ("Terex"), the relationship between Deloitte & Touche and the Company. On September 10, 1992, representatives of Deloitte & Touche had further discussions with Company officials, including the Chairman and Secretary of both the Company and Terex, and the Chief Financial Officer of Terex, regarding the auditor-client relationship. In addition, on September 22, 1992, representatives of Deloitte & Touche discussed with the Company's Vice President, Finance the relationship between Deloitte & Touche and the Company. These discussions focused on certain changes that Deloitte & Touche believed needed to occur in order for Deloitte & Touche to be willing to continue to serve as the Company's auditor. *The matters discussed included changes requested by Deloitte & Touche relating to financial reporting process and the role of the Audit Committee in overseeing that process, performance of timely quarterly reviews by Deloitte & Touche and timely discussions with Deloitte & Touche of proposed significant transactions.* Deloitte and Touche believed, based on those discussions, that the Company was in agreement with the matters discussed, which was the basis for Deloitte & Touche Company's independent auditor. On October 2, 1992, we were advised by the Chief Financial Officer of Terex that we were dismissed as auditors.

50. In the interim, on October 12, 1992, *Businessweek* questioned the accounting practices used by Terex. After interviewing former Terex employees and receiving access to internal financial statements, *Businessweek* reported that Terex had used questionable accounting practices for years in order to overstate earnings.

52. On Friday, December 4, 1992, *Businessweek* released its edition dated December 14, 1992 which revealed (i) that Fruehauf avoided defaulting on loan agreements in the second quarter 1991 only by obtaining waivers, which fact was not disclosed to the investing public....

(Pl's Fruehauf Compl. ¶¶ 41–42, 48–50, 52) (emphasis in original).

The October 12, 1992 *Business Week* article, referenced in plaintiff's complaint against Fruehauf further indicated that "[CEO Randolph] Lenz's achievements stem less from operational skills than from the use of highly aggressive and questionable accounting practices ..., [and that] Terex's purported success in turning around distressed companies was due in large part, to highly questionable accounting machinations."

The December 14, 1992 *Business Week* article, which hit the stands on December 4, 1992, and provided additional basis for plaintiff filing the action against Fruehauf, also noted that "the Securities and Exchange Commission [had] begun an investigation into other questionable accounting practices at Terex...."

Plaintiff maintains, *e.g.*, that the SEC's investigation of Terex did not put him on "inquiry notice" with respect to Deloitte's potential involvement with the "wrongdoing."

This Court believes that a question of fact exists as to whether or not plaintiff had "inquiry notice" of a potential claim against Deloitte from misrepresentations or misleading statements at approximately the same time he filed the action against Fruehauf. This Court does not believe it would be proper, based on the state of the record before this Court at this time, to rule as a matter of law that plaintiff was on "inquiry notice" of a potential claim at the time of the filing of the Fruehauf lawsuit on December 10, 1992.

### b. Reasonable Diligence

■ Even if this Court were to conclude that plaintiff was on "inquiry notice", plaintiff asserts that he discharged his duty through the exercise of "reasonable diligence." *In-Store Advertising*, 840 F.Supp. at 288–89. The reasonable diligence inquiry is a form of a tolling provision. *See generally Tregenza*, 12 F.3d at 720–21.

Deloitte contends that plaintiff failed to pursue discovery in the Fruehauf case. Upon review of the pleadings, the Court notes that the parties eventually entered into a stipulation staying discovery until such time as the Fruehauf and Underwriter defendants' motions to dismiss could be decided. However, prior to that time plaintiff brought a motion to compel seeking discovery of Deloitte's papers.

The Court does not find that plaintiff "shut his eyes to the facts which call for investigation …," such that knowledge of Deloitte's alleged fraud or misrepresentations can be imputed to him. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983). The "fraud" or "misrepresentation" that plaintiff would have had to undercover here was the facts that led to the restatement of Fruehauf's financial

statements in the 1992 10–K, which was released to the public on April 30, 1993.

Thus, the "misrepresentation" claimed by plaintiff involves a change in accounting methods, which revealed a loss in the financial statements that were included with the prospectus. Based on the record before this Court, it appears that neither plaintiff nor his counsel had access to Deloitte's workpapers or to Fruehauf's books, and therefore, it is doubtful that plaintiff could have discovered the above-mentioned "error" or "misrepresentation." *See In–Store Advertising*, 840 F.Supp. at 289.

However, based on the facts as presented to this Court thus far, this Court is not prepared to conclude, as a matter of law, that plaintiff did or did not exercise reasonable diligence. In this Court's opinion, material issues of fact exist on this issue which preclude this Court, at this time, ruling as a matter of law on this issue.

For the reasons set forth above, the Court denies defendant's motion for summary judgment based on its statute of limitations argument.

### 2. Causation

Defendant maintains that plaintiff cannot satisfy the causation requirement under § 11(e) and Rule 10b–5. Section 11(e) provides that:

> if the defendant proves that any portion or all of such damages represents other than the depreciation in value … resulting from such part of the registration statement[ ] with respect to which his liability is being asserted, … such portion of all of such damages shall not be recoverable.

The causation analysis under § 11 is essentially the same as Rule 10b–5's proximate cause element. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir.1994).[4]

■ Plaintiff's Rule 10b–5 claim is based, at least in part, on the fraud on the market

---

**4.** Defendant explains that the distinction between causation for § 11 and Rule 10b–5 is technical. Section 11(e) establishes a loss causation defense and causation is an element of § 10(b) claims. The following elements are necessary to state a claim under § 10(b) and Rule 10b–5: (1) a mis-

statement or omission; (2) of a material fact; (3) made with scienter; (4) upon which the plaintiff relied; and (5) that proximately caused the plaintiff's injury. *See Wright v. National Warranty Co.*, 953 F.2d 256, 261 n. 1 (6th Cir.1992).

theory.[5] To establish a "loss causation" defense under § 11(e), Deloitte needs to prove that the depreciation in the value of Fruehauf stock resulted from factors other than the alleged material misstatement in the financial statements with respect to Fruehauf's earnings for 1989 and 1990, which Deloitte audited. Defendant has the burden of proof on this defense, and as the Ninth Circuit indicated "[t]hough it has been recognized by courts, as a 'heavy burden,' it is not insurmountable, and courts have awarded summary judgment to the defendant in appropriate cases." *In re Worlds*, 35 F.3d at 1422 (citation omitted). "Loss causation exists where 'the misrepresentation *touches upon* the *reasons* for the investment's decline in value.'" *Id.* (citations omitted) (emphasis in original).[6]

In *In re Worlds*, the Court reversed the district court's grant of summary judgment in favor of Deloitte because "[t]he plaintiffs introduced expert testimony that those disclosures [a series of public disclosures] *directly related* to the transactions for which Deloitte allegedly made erroneous accounting determinations...." *Id.* (emphasis in original).

Upon review of the pleadings, and specifically the document attached to defendant's response brief which provides a history of trading for Fruehauf stock, the Court does not find that plaintiff has provided evidence of the same nature or extent as the plaintiff in *In re Worlds* with respect to defendant's alleged misrepresentation "causing" the de-

cline in stock prices. The high point of trading for Fruehauf stock occurred on April 10, 1992, when the stock reached $17¾ and closed at $16½. On May 5, 1992, the company released its financial results for the first quarter ending March 31, 1992, reflecting a net loss of $4.3 million. The stock closed at $11⅞ on May 8, 1992.

The stock rose to $13 on June 12, 1992, only to drop to $8½ on June 24, 1992. On June 16, 1992, the *Dow Jones News Wire* reported that analysts had slashed their 1992 earnings estimates and downgraded the investment rating for Fruehauf, which may help explain the drop in June of 1992. The stock traded at $12⅞ on June 15 and dropped to $10½ on June 16.

These "disclosures" suggest that the stock price was affected by the news of losses by Fruehauf. However, these disclosures do not involve, at least directly, the misrepresentation allegedly made by Deloitte. The disclosure of Deloitte's "misrepresentation" occurred publicly on April 30, 1993, when the 1992 10-K "restated" the financial statements that were contained in the prospectus. By April 29, 1993, the stock had dropped to $3¼. On April 30, it closed at $3⅝, and the stock continued to trade at the $3 to $4 range for several months. Accordingly, plaintiff cannot show that the disclosure made in the restatement "caused" the price to decline.

However, plaintiff does not plead this as a "restatement" case, but rather alleges that Deloitte's "misrepresentation" in the pro-

---

**5.** Plaintiff Rebenstock could not have relied on any claimed misrepresentations in the registration statement, because he purchased in the aftermarket and admits that he never read any of the materials. However, a plaintiff can meet the "reliance" element of a Rule 10b-5 claim through the "fraud on the market theory," which:

... is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements ... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1158 (6th Cir.1994) (citations omitted); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197–200 (6th Cir.1990).

**6.** Other courts have defined "loss causation" differently. For example, the Seventh Circuit has explained that:

"Loss causation" is an exotic name—perhaps an unhappy one—for the standard rule of tort law that the plaintiff must allege and prove that, *but for* the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains.

*Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990); *Ballan v. Upjohn Co.*, 814 F.Supp. 1375, 1384 (W.D.Mich. 1992).

spectus "artificially inflated" the price of the stock as sold at the IPO ($11 per share). Thus, plaintiff asserts that pursuant to the "fraud on the market theory" defendant's misrepresentation artificially altered the price of the security.

The Eighth Circuit in addressing "causation" in the context of a Rule 10b–5 case noted that:

> [w]e find the district court's view of causation too narrow under legal principles governing Rule 10b(5) cases. Plaintiffs are not required to meet a strict test of direct causation under Rule 10b–5; they need only show "some causal nexus" between [defendant's] improper conduct and plaintiff's losses. Traditional tests of proximate cause derived from tort principles are very much germane.
>
> This is a "fraud on the market" case. In such cases, causation is not premised on any specific transaction between plaintiff and defendant, nor is there required any proof that the plaintiff was even aware that a misrepresentation was made. Causation lies in the fact that the plaintiff relied on the market price of the security as an indicator of the future value of the stock. To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed.

*In re Control Data Corp. Sec. Litig.,* 933 F.2d 616, 619–20 (8th Cir.) (citations omitted), *cert. denied,* 502 U.S. 967, 112 S.Ct. 438, 116 L.Ed.2d 457 (1991); *see also Ockerman,* 27 F.3d at 1158–60.[7]

The *Control Data* Court went on to explain that a jury could reasonably find that the defendant's improper accounting artificially altered the price of the stock, and therefore that the plaintiffs had presented sufficient "causal nexus" between the alleged misrepresentations through accounting errors and the drop in the stock price. *Control Data,* 933 F.2d at 620–21.

Plaintiff in this case is also relying on the "artificial inflation or alteration" concept, and maintains that the initial IPO price was altered or inflated based, in part, on Deloitte's misrepresentations in the prospectus. Plaintiff's expert, Candace Preston, states in her supplemental affidavit dated July 14, 1995, that:

> 4. Based upon my review of available information, including, *inter alia,* the restatement in Fruehauf's 1992 10–K of the 1989 and 1990 financial statements included in the Prospectus and Registration Statement, I opined in my affidavit dated April 15, 1994, that purchasers of Fruehauf common stock issued pursuant to the IPO Prospectus and Registration Statement were damaged in that they purchased such stock at artificially inflated prices. I further opined that the price of the common stock sold pursuant to the Prospectus was artificially inflated as a direct result of material representations in the Prospectus and Registration Statement including, but not limited to, the misrepresentation that Fruehauf had earned *profits* of $2,324,000 in 1990 when, according to the 1992 10–K, Fruehauf actually suffered a *loss* of $2,176,000 in that year (the last full year before the IPO).
>
> 5. Subsequent to my April 15, 1994 opinion, on March 9, 1995, it was publicly disclosed for the first time that the financial statements included in the Prospectus and Registration Statement would be restated for a second time in order to reflect the fact that Fruehauf's 1990 losses actually exceeded $51 million (the "Second Restatement"). In light of the Second Restatement, plaintiff's counsel has again asked me to render an opinion as to wheth-

---

**7.** Defendant contends that the Sixth Circuit has rejected the "fraud created the market" theory. The Sixth Circuit in *Ockerman* explained that "[a] second theory of reliance on the market, a fraud *created* the market theory, has been applied in other circuits to newly-issued securities traded on an undeveloped market." *Ockerman,* 27 F.3d at 1159 (emphasis in original).

The Sixth Circuit also addressed the "fraud created the market theory" in *Freeman,* in which the Court noted that:

> [w]e express no opinion on the sufficiency of appellees' claims under a fraud created the market theory. The fraud created the market theory is separate and distinct from the fraud on the market theory, and is supported by an entirely different rationale.

*Freeman,* 915 F.2d at 200 (citation omitted).

er the misrepresentations of Fruehauf's financial condition and performance in the financial statements included in the Prospectus and Registration Statement artificially inflated the price of Fruehauf common stock during the Class Period.

The Court finds that a question of fact exists with respect to causation. As noted above, in the context of a "loss causation" defense, defendant has a heavy burden. Although this Court does not conclude that Preston's affidavit establishes that plaintiff has proven causation for the § 11 or § 10(b) claims, the Court is similarly not convinced that defendant is entitled to summary judgment based on plaintiff's "failure" to show causation.

### B. Plaintiff's Motion for Partial Summary Judgment

■ Plaintiff contends that he is entitled to summary judgment with respect to the § 11 claim. Section 11 provides a private remedy for the purchaser of a security issued pursuant to a materially false registration statement. The purchaser must establish that a statement contained within the registration statement and prospectus was false either: (1) because it omitted facts required by SEC regulations to be included or because it omitted facts required by SEC regulations to be included or because it omitted statements of material fact necessary to make statements contained in the registration statement not misleading. *See Anderson v. Clow*, Fed.Sec.L.Rep. (CCH) ¶ 97,807, 97,986, 1993 WL 497212 (S.D.Cal. 1993).

■ With respect to whether plaintiff has proven that Deloitte is liable for its alleged misrepresentations under § 11, defendant contends that it has never "admitted" that the opinion it gave with respect to the financial statements in the prospectus was false (*See* David Simmons' Supplemental Aff. ¶ 3). Plaintiff suggests that Deloitte admitted the error when Fruehauf filed the restatement in its 1992 10–K. Defendant, however, notes that the restatement was Fruehauf's undertaking, and was based on a change in auditing of debt by the company—Deloitte characterizes it is a "non-operational non-cash flow

nature of the accounting adjustment." (Def's.Resp.Br. at 16–17).

The courts have recognized that § 11 permits an action against an accountant based on material misrepresentations or omissions in a registration statement, but only as to those portions of the statement that purport to have been prepared or certified by the accountant. *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir.1994). The *Monroe* Court explained that:

> [a]lthough issuers are held strictly liable under § 11 for damages resulting from misrepresentations in a registration statement, an accountant has a due diligence defense; § 11 therefore imposes a negligence standard for an accountant's liability.

*Id.* (citation omitted).

Accordingly, the Court indicated that:

> [w]e have held that an accountant's good faith compliance with [GAAP] and [GAAS] discharges the accountant's professional obligation to act with reasonable care. A corollary rule, however, is that compliance with GAAP and GAAS do[es] not immunize an accountant who consciously chooses not to disclose on a registration statement a known material fact.

*Id.*

Defendant contends that it is entitled to a "due diligence" defense because it reasonably relied on representations by Fruehauf's management in reaching its conclusion that the financial statements complied with GAAP. Plaintiff notes that while preparation of the financial statements was the responsibility of Fruehauf's management, the auditor's opinion as to whether the issuer's financial statements comply with GAAP is the sole responsibility of the auditor.

Plaintiff also maintains that GAAP require that an issuer restate erroneous financial statements only if the errors are material. *See SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1235 (S.D.N.Y.1992). The *SEC* court explained that:

> GAAP requires that changes in the accounting principles and their effect on income be disclosed in the financial state-

ments for the period in which the change is made if those changes have a material effect upon income before extraordinary items or net income.

*Id.* (citing Accounting Principles Board 20 (APB 20)).

Defendant contends Fruehauf's new management restructured its long-term debt incurred in connection with previous financing, involving, *e.g.*, detachable warrants and debt issue costs. Thus, Fruehauf decided to change its accounting principles with respect to reporting long-term debt. Defendant indicates that one reason for restating financials under APB 20 is to report changes in accounting principles. *SEC*, 797 F.Supp. at 1235. APB 20 reflects that there are differing views on how changes in accounting principles should be reported. *See* APB 20 ¶ 14(a)–(d); *see also* Emerging Issue Task Force (EITF) 86–18 (addresses accounting methods for modification of debt terms).

The Court finds that a genuine issue of fact exists with respect to whether Deloitte acted in accordance with GAAP and GAAS in performing the accounting and auditing for the financial statements that were contained in the Fruehauf prospectus. Plaintiff's expert, Edwin Rosenthol, says that Deloitte failed to act in accordance with GAAP and GAAS (Pl's.Resp.Br. Ex. I, Rosenthol's Supplemental Aff.). Defendant responds with the affidavit of David Simmons, who served as audit engagement partner with Deloitte (Def's.Resp.Br. Ex. A, Simmons' Aff.). Simmons indicates that Fruehauf was responsible for the preparation of the financial statements, and that the Deloitte's involvement complied with GAAP and GAAS (*Id.* ¶¶ 2, 4 & 11).

Given that the Court finds a genuine issue of material fact with respect to the liability issue of plaintiff's § 11 claim, plaintiff's motion for partial summary judgment is denied. In addition, the Court notes that even if plaintiff could show liability, the damages issue would still be left open based on the Court's discussion above, in which the Court concluded that a issue of fact exists with respect to causation.

### III. Conclusion

For the reasons set forth above, the Court concludes that defendant's motion for summary judgment and plaintiff's motion for partial summary judgment shall be denied.

An Order consistent with this Opinion shall issue forthwith.