**WHIRLPOOL FINANCIAL CORPORATION, Plaintiff–Appellant,**

v.

**GN HOLDINGS, INC., f/k/a CCHP Delaware, Inc., W.R. Grace & Company–Connecticut, Kevin Clark, Michelle Clark, Robert Bok, and Diane Bok, Defendants–Appellees.**

No. 95–1292.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1995.

Decided Sept. 28, 1995.

Rehearing and Suggestions for Rehearing In Banc Denied
Oct. 31, 1995.

Jonathan G. Bunge, John F. Young, Roy M. Van Cleave (argued), Keck, Mahin & Cate, Chicago, IL, for plaintiff-appellant Whirlpool Financial Corporation, a Delaware corporation.

Mark E. Ferguson (argued), Mark L. Levine, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL, for defendants-appellees GN Holdings, Incorporated, a Delaware corporation fka CCHP Delaware, Incorporated, W.R. Grace & Company–Connecticut, a Connecticut corporation.

Matthew F. Kennelly, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for defendants-appellees Kevin Clark, Michelle Clark, Robert Bok, Diane Bok.

Before ESCHBACH, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

■ Whirlpool Financial Corporation filed this securities action on July 11, 1994, against GN Holdings, Inc., W.R. Grace & Co.–Connecticut, Kevin and Michelle Clark, and Robert and Diane Bok seeking rescission of Whirlpool's $10 million loan to GN. In its complaint, Whirlpool alleged: (Count 1) violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder; (Count 2) violation of Section 13 of the Illinois Securities Law of 1953; and (Count 3) violation of Section 12(2) of the Securities Act of 1933. In response to a motion filed by the defendants pursuant to Fed.R.Civ.P. 12(b)(6), the district court dismissed Whirlpool's federal claims with prejudice because they were filed beyond their respective statutes of limitation. The court also dismissed the state claim without prejudice. The end result was that the action was dismissed in its entirety. For our review of the district court's Rule 12(b)(6) dismissal of this action, we summarize and take as true the facts alleged by Whirlpool in its complaint and supporting documents.

In July 1991, Whirlpool Financial Corporation made a $10 million loan to GN Holdings, Inc., to partially finance GN's purchase of Cross Country Healthcare Personnel, Inc. ("CCHP"). CCHP provided hospitals across the United States with temporary health care personnel such as nurses, physical therapists, and occupational therapists. GN, which W.R. Grace had created as the vehicle through which it would purchase CCHP, executed a promissory note in favor of Whirlpool for the loan. Under the terms of the note, Whirlpool was to receive 15.5% annual interest (payable in quarterly installments) with a balloon payment of the principal in 1998. GN also borrowed $44.8 million from Heller Financial, Inc., and W.R. Grace invested $25.2 million through the purchase of stock.

To solicit financing for the purchase, the defendants, with the help of Shearson Lehman Brothers, circulated a Private Placement Memorandum, which provided narrative information,[1] historical financial data,

---

1. The Private Placement Memorandum included several optimistic and self-laudatory statements,

and projections for future performance. These projections were later, before Whirlpool purchased the note, "revised and made significantly less optimistic." The Private Placement Memorandum and the subsequent amendment set out projections for, among other things, net sales, operating profit, pretax profit and net income during the remainder of 1991 and fiscal years 1992 and 1993. To allow Whirlpool to monitor GN's performance, the loan agreement required GN to send to Whirlpool monthly, quarterly, and yearly financial statements accompanied by management reports. GN complied with these requirements and Whirlpool received the financial statements as scheduled.

As often happens with new ventures, the projections painted a much rosier picture than what actually unfolded. In fact, in the years 1991 through 1993, net sales were 32 to 48% lower than projected, operating profit was 50 to 73% lower than projected, pretax profit was 95 to 257% lower than projected, and net income was 104 to 283% lower than projected. On September 12, 1991, shortly after receiving the first financial statement, Whirlpool account executive Steven Furman first traveled to Boca Raton, Florida (GN's headquarters) to question GN executives about the discrepancies between the financial projections and actual performance. Furman made similar trips on February 5, 1992; July 24, 1992; October 16, 1992; and June 23, 1993. At these meetings, GN executives explained that the general economic recession was softening the demand for traveling nurse services but that better times were just around the corner. Happy days did not arrive, and GN defaulted on the interest payment due Whirlpool on April 1, 1994. Whirlpool filed this suit in July of 1994.

We review *de novo* the district court's Rule 12(b)(6) dismissal of this action and take, as we have, Whirlpool's factual allegations as true, giving Whirlpool the benefit of all reasonable inferences drawn therefrom. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). However, as we have observed in the context of securities litigation, if a plaintiff pleads facts that show its suit barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis. *Tregenza v. Great Am. Communications Co.,* 12 F.3d 717, 718–19 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994).

Before reviewing the dismissal of its action for failing to meet the statutes of limitation for Rule 10b–5 and Section 12(2), we make note of the major thrust of Whirlpool's complaint. Whirlpool's brief summarizes what it views as the highly significant factual underpinnings as follows:

> The Revised Projections were unreasonable when made because they were based on GN's historical performance while defendants knew, **but did not disclose,** that the industry was subject to material adverse trends including proposed and enacted state and federal legislative and regulatory actions which would limit GN's revenue, increased competition to recruit nurses, trends toward reduced usage of temporary nurses, trends toward increased compensation and benefits for traveling nurses, shifts from inpatient to ambulatory care and trends toward hospital closings and a decrease in licensed beds.

(Whirlpool brief at 8) (emphasis added). The highlighted portion of the foregoing quote could be read to mean that Whirlpool asserts that the defendants had a duty to disclose this information—apart from a duty to make reasonable projections.

If the failure to disclose the above information formed the sole basis for Whirlpool's Rule 10b–5 claim, the matter would be at an end. The information Whirlpool states that the defendants failed to disclose is widely available public information and, therefore, by definition is available to any and all who take the time to discover it.

For example, Whirlpool says that the defendants failed to disclose the existence of state and federal legislation and regulations which exemplified a negative trend that af-

---

such as describing CCHP as "the largest, most respected and most imitated firm in the travel nurse industry"; stating that the travel nurse industry was "one of the 25 hottest careers for the 1990s"; and citing "one industry expert" as estimating "the size of the industry at approximately \$350 million in 1990 and growing in excess of 20% per year."

fected the viability of GN's projections. Specifically, Whirlpool in its complaint cites legislation adopted prior to 1991 in California, Connecticut, Florida, Massachusetts, New Jersey, and New York regulating the fees charged by traveling nurse agencies, as well as attempts to take similar action in Kentucky, Louisiana, Michigan, and Rhode Island. Moreover, the information regarding adverse industry trends, which Whirlpool alleges defendants failed to disclose, is public information and was available at the time Whirlpool purchased the note. *See, e.g.,* Emily Friedman, *Nursing: Breaking the Bonds?*, 264 JAMA 3117 (1990) ("In spite of nursing's historic ability to beat the odds and its recent record of accomplishment and growing power, the profession's future is uncertain. It is, like most of health care, facing restricted funding, work force shortages, rationing, and political upheavals.")

■ The nondisclosure of enacted or pending legislation and industry-wide trends is not a basis for a securities fraud claim. *See Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 515 (7th Cir.1989) ("Securities laws require issuers to disclose *firm-specific* information; investors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a whole to produce a value for stock."); *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323–24 (7th Cir.1988) ("The securities laws require the disclosure of information that is otherwise not in the public domain. Sellers of securities need not 'disclose' the statutes at large of the states in which they operate . . . .") (citation omitted).

■ However, we discern that it is not the failure of the defendants to disclose adverse legislation and industry trends that forms the basis of Whirlpool's Rule 10b–5 claim. Rather the thrust of its argument is that the defendants' revised projections were made without a reasonable basis. In other words, there was no reasonable basis for the defendants' revised projections in light of the adverse legislative, regulatory, and industry trends known to them. Such a Rule 10b–5 claim based on projections made in bad faith or without a reasonable basis is cognizable under the securities laws. *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1333 (7th Cir.1995). With this clarification of the appropriate nature of Whirlpool's claim, we examine the district court's rationale for the dismissal of Whirlpool's action—its failure to comply with the applicable statutes of limitation.

■ As alluded to above, in both Section 12(2)[2] and Rule 10b–5 actions, a plaintiff must file its claim for relief within one year from the time that its action accrues. 15 U.S.C. §§ 77m, 78i(e); *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 361–62, 111 S.Ct. 2773, 2781, 115 L.Ed.2d 321 (1991). Moreover, inquiry notice is sufficient to begin the limitations clock. *See* 15 U.S.C. § 77m; *Tregenza,* 12 F.3d at 722. Inquiry notice starts the running of the statute of limitations "when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim." *Id.* at 718. Thus, to determine if inquiry notice has been triggered an objective "reasonable" diligence standard must be applied to the facts.

The defendants argue that, assuming they committed any fraud, reasonable diligence by Whirlpool would have suggested the possibility of fraud before July 11, 1993 (one year prior to the date Whirlpool filed its complaint). They point to the dramatic discrepancies (Whirlpool's own description) between the projections and the actual results, which the defendants argue would have led a reasonable investor to suspect fraud.

In *Tregenza,* Great American Communications Company, with the help of Shearson Lehman Brothers, sold several million shares of common stock to the public in order to retire debt it incurred from purchasing Taft Broadcasting Company for $1.5 billion. Po-

---

2. After the district court dismissed Whirlpool's complaint, the Supreme Court held that a "prospectus" for § 12(2) purposes includes only public offerings by issuers or their controlling shareholders. *Gustafson v. Alloyd Co.,* — U.S. —, 115 S.Ct. 1061, 1073–1074, 131 L.Ed.2d 1 (1995). As this case does not concern a public offering, § 12(2) is inapplicable, and this serves as an alternative ground for affirming the district court's dismissal of Whirlpool's § 12(2) claim.

tential purchasers were told "that the stock was greatly undervalued and within two years its price should be well above $20 [and] that the stock's downside risk at its current price level of $12 to $12.50 was less than 10 percent." *Tregenza*, 12 F.3d at 719–20. Within one year, the price of the stock had fallen to $1.50. The complaint alleged that at the time of these statements the stock was grossly overvalued and the downside risk was immense because Great American was so debt ridden. We held that the precipitous fall in the price of Great American's stock was sufficient to put the plaintiffs on inquiry notice. We reasoned that "an investor would have become suspicious and investigated when Lehman's emphatic and precise prediction was so swiftly and dramatically falsified." *Id.* at 720.

Likewise, in this case, the dramatic discrepancies between the very precise projections made by the defendants and the actual results, which Whirlpool learned through the financial statements, were sufficient to give notice to Whirlpool and spur them to investigate—inquiry notice which started the limitations clock.[3] This is not to say that the discrepancies proved fraud, but simply that a reasonable investor would have believed that fraud was a possible explanation.

Moreover, once the significant discrepancies between the projections and actual results placed Whirlpool on notice regarding the possibility of fraud, the information Whirlpool says it needed to "uncover" the alleged fraud was in the public domain. In today's society, with the advent of the "information superhighway," federal and state legislation and regulations, as well as information regarding industry trends, are easily accessed. A reasonable investor is presumed to have information available in the public domain, and therefore Whirlpool is imputed with constructive knowledge of this information. *See Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir.1995).

When examined consistent with an objective reasonable diligence standard, the only reasonable inference that could be drawn from the facts as alleged by Whirlpool was that it was put on inquiry notice before July 11, 1993. Thus, the district court properly determined that Whirlpool's federal claims, not asserted until its complaint was filed on July 11, 1994, were time barred.

Whirlpool finally argues that even if it were put on inquiry notice before July 11, 1993, the defendants should be equitably estopped from arguing the statute of limitations because they "lulled" Whirlpool into missing the statute of limitations. Whirlpool contends that the explanations Furman received for GN's poor performance—primarily the general economic recession—concealed the defendants' alleged fraud. Equitable estoppel may apply where a defendant took active steps to conceal evidence from the plaintiff that the plaintiff needed in order to determine it had a claim. *Singletary v. Continental Ill. Nat'l Bank*, 9 F.3d 1236, 1241 (7th Cir.1993). However, in light of our determination that the information Whirlpool needed to uncover the fraud was in the public domain, GN's continued attempts to explain away the discrepancies between the revised projections and the actual earnings could not have prevented Whirlpool from filing its complaint on time.

AFFIRMED.

---

3. Whirlpool maintains that the limitations clock should not have run because, notwithstanding its investigation of the discrepancies (Furman's trips to Boca Raton), it could not uncover the fraud. In essence, Whirlpool is arguing that the statute of limitations should be equitably tolled—in spite of reasonable diligence, it could not discover the facts underlying the defendants' fraud. *See Tregenza*, 12 F.3d at 721. However, as we noted in *Tregenza*, the plain import of the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), is that "when knowledge or notice is required to start the statute of limitations running, there is no room for equitable *tolling.*" *Tregenza*, 12 F.3d at 721. Therefore, consistent with our determination that Whirlpool was on notice of the facts that would have led a reasonable person to investigate whether he had a claim, the one-year statute of limitations was not subject to equitable tolling.