PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 12-3454
———

PENSION TRUST FUND FOR OPERATING ENGINEERS;
Individually and on behalf of itself
and all others similarly situated,
Appellant

v.

MORTGAGE ASSET SECURITIZATION
TRANSACTIONS, INC.; DAVID MARTIN;
PER DYRVIK; HUGH CORCORAN;
PETER SLAGOWITZ; UBS REAL ESTATE
SECURITIES, INC.;
UBS SECURITIES, LLC; UBS AMERICAS INC.
———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-10-cv-00898)
District Judge:  Honorable Claire C. Cecchi
———

Argued June 25, 2013
Before:  FUENTES, FISHER
and CHAGARES, *Circuit Judges*.

(Filed: September 17, 2013)

Douglas S. Wilens, Esq. (ARGUED)
Robbins Geller Rudman & Dowd
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
        *Counsel for Appellant Pension Trust Fund for
        Operating Engineers*

Peter S. Pearlman, Esq.
Cohn, Lifland, Pearlman, Herrmann & Knopf
Park 80 West – Plaza 1
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
        *Counsel for Appellant Pension Trust Fund for
        Operating Engineers*

Rukhsanah Singh, Esq.
Liza M. Walsh, Esq.
Connell Foley
85 Livingston Avenue
Roseland, NJ  07068
        *Counsel for Appellees Mortgage Asset
        Securitization Transactions,
        Inc., David Martin, Per Dyrvik,
        Hugh Corcoran, UBS Real
        Estate Securities, Inc.,
        UBS Securities, LLC, Peter Slagowitz,
        and UBS Americas Inc.*

2

Lawrence J. Zweifach, Esq. (ARGUED)
Gibson Dunn
200 Park Avenue, 47th Floor
New York, NY  10166
    *Counsel for Appellees Mortgage Asset*
    *Securitization Transactions,*
    *Inc., David Martin, Per Dyrvik,*
    *Hugh Corcoran, UBS Real*
    *Estate Securities, Inc.,*
    *UBS Securities, LLC, Peter Slagowitz,*
    *and UBS Americas Inc.*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Lead Plaintiff Pension Trust Fund for Operating Engineers (the "Operating Engineers") appeal from the District Court's initial order dismissing without prejudice their amended class action complaint (the "Amended Complaint"), which alleged violations of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, by subsidiaries and employees of UBS AG ("UBS"), for failure to plead compliance with the one-year statute of limitations set forth in Section 13 of the Securities Act, 15 U.S.C. § 77m.  The Operating Engineers also appeal from the District Court's subsequent order dismissing with prejudice their second amended class action complaint (the "Second Amended Complaint") as untimely

3

under an inquiry notice standard.  Although we hold that a Securities Act plaintiff need not plead compliance with Section 13 and that Section 13 establishes a discovery standard for evaluating the timeliness of Securities Act claims, we nonetheless conclude that the class action claims in the original complaint (the "Original Complaint") were untimely.  Therefore, we will affirm.

## I.

### A.[1]

This appeal involves mortgage-backed securities, investment vehicles that were among the casualties of the financial crisis of the late 2000s.  In a traditional mortgage, a lending institution, known as the originator, extends credit to a borrower.  In exchange, the borrower promises to repay principal and interest on the loan, and the borrower's real property serves as collateral in case of her default.  The originator follows guidelines, known as underwriting standards, to ensure that it receives a return on its investment.

---

[1] The factual background is drawn from the Second Amended Complaint and public records.  *See Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (noting, in deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), that a court may consult "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" (citations omitted)).  The Operating Engineers do not contest our consideration of this external evidence.

For example, to evaluate the borrower's creditworthiness, the originator assesses the ratio of her monthly mortgage-related obligations to her monthly gross income (the "debt-to-income ratio"). And to assess the collateral's worth, the originator evaluates the ratio of the outstanding mortgage obligation to the property's appraised value (the "loan-to-value ratio").

For mortgage-backed securities, the originator sells the loan to a financial institution to realize immediate profit and to reduce future risk of default. The financial institution pools the loan with others, deposits the loans into a trust, and sells certificates issued by the trust to investors. Investors are entitled to receive cash flows from the principal and interest payments made by the borrowers on the loan pool in the trust. The rate of return on the securities partially depends on the riskiness of the underlying loans, which, in turn, is partially measured by the debt-to-income and loan-to-value ratios.

The mortgage-backed securities in this case, known as the MASTR Pass-Through Certificates, Series 2007-3 (the "Certificates"), were offered to the public on May 14, 2007. UBS Real Estate Securities, Inc. ("UBS Real Estate"), the sponsor of the Certificates, purchased the underlying loans from originators, including Countrywide Home Loans, Inc. ("Countrywide") and IndyMac Bank, F.S.B. ("IndyMac"). UBS Real Estate then sold the loans to Mortgage Asset Securitization Transactions, Inc. ("MASTR"), the depositor of the Certificates. MASTR next placed the loans into the MASTR Adjustable Rate Mortgages Trust 2007-3 (the "MASTR Trust"), the issuer of the Certificates. UBS Securities, LLC ("UBS Securities"), the underwriter of the Certificates, finally sold the Certificates to investors like the

5

Operating Engineers, who purchased Series 12A1 Certificates with a face value of $5,123,977 on September 18, 2007.[2]

The Certificates were issued pursuant to a Securities and Exchange Commission ("SEC") Form S-3 Registration Statement filed on December 16, 2005, as amended by an SEC Form S-3/A supplemental pre-effective Registration Statement on April 4, 2006 (together, the "Registration Statement"), and an SEC Form 424B5 Prospectus Supplement filed on May 14, 2007 (the "Prospectus Supplement" and, together with the Registration Statement, the "Offering Documents"). The Registration Statement was signed by MASTR's officers and directors, including David Martin, Per Dyrvik, Hugh Corcoran, and Peter Slagowitz.

The Offering Documents stated that Countrywide originated about 52% and IndyMac originated about 40% of the mortgages backing the Certificates. The Offering Documents assured investors that the underlying loans were originated pursuant to particular underwriting policies, practices, and procedures and in compliance with federal and state laws and regulations. For example, the Offering Documents indicated that the availability of the loans was limited to those borrowers whose creditworthiness, as revealed by the debt-to-income ratio, was within accepted limits. Additionally, the Offering Documents provided that

---

[2] The MASTR Trust is owned and controlled by MASTR. MASTR, UBS Real Estate, and UBS Securities are subsidiaries of UBS Americas Inc. ("UBS Americas"), which is, in turn, a subsidiary of UBS.

the real property that was collateral for the loans was appraised pursuant to the generally-accepted Uniform Standards of Professional Appraisal Practice and that certain quantities of the loans were within specific ranges of loan-to-value ratios. Finally, the Offering Documents represented that no material legal proceedings were pending against "the sponsor, the depositor or the issuing entity" of the Certificates. App. at 1728. Based on these guarantees, Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P's" and, together with Moody's, the "Ratings Agencies") rated the Series 12A1 Certificates as AAA, the highest quality investment grade, in September 2007.

However, because Countrywide and IndyMac "systematically ignored" and "completely" and "wholly disregarded" proper underwriting standards, UBS's statements in the Offering Documents about the loans underlying the Certificates were materially false and misleading. *Id.* at 382 ¶ 9, 384 ¶ 14, 411 ¶ 86. In particular, the debt-to-income ratios were inaccurate because they were based on inflated income figures, and the loan-to-value ratios were skewed because they were based on inflated property appraisals. As a result of UBS's untrue statements and omissions about the underwriting standards, the Certificates were substantially more risky than disclosed in the Offering Documents.

From late 2007 through early 2009, many news articles linked the high delinquency rates of mortgages originated by Countrywide and IndyMac to the abandonment of accepted underwriting standards. For example, on April 30, 2008, the Wall Street Journal reported on the "mounting evidence of

serious problems with [Countrywide's] underwriting of many home loans," which included allegations that the company "deliberately overlooked inflated income figures for many borrowers," and relaxed its lending standards regarding the estimated values of the real estate. *Id.* at 1949. Also in 2008, the non-profit Center for Responsible Lending released a pair of reports criticizing Countrywide's and IndyMac's underwriting standards. *See*, *e.g.*, *id.* at 1960 (describing how Countrywide's "appraiser was being 'strongly encouraged' to inflate property values on homes," and "employees were coaching borrowers to falsify their incomes on their applications"). Throughout this time, numerous class action securities suits were filed against Countrywide and IndyMac related to their lax underwriting standards.

On February 20, 2009, citing inappropriate underwriting standards, Moody's reduced the rating of the Series 12A1 Certificates to B2, a speculative grade. Similarly, on August 13, 2009, S&P's reduced the rating of the Series 12A1 Certificates to B. By February 2010, because of the deficient underwriting standards, about 61% of the underlying loans were in delinquency, default, or foreclosure, and the value of the Certificates on the secondary market had decreased by 40% to 50%. As a result, the monthly distributions that the Operating Engineers received from the MASTR Trust for their Certificates were significantly reduced. And if the Operating Engineers had sold their Certificates on the secondary market, then they would have suffered a substantial loss.

8

B.

On February 22, 2010, one year after Moody's downgraded the rating of the Certificates,[3] an investor filed the Original Complaint asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o, against MASTR, UBS Real Estate, UBS Securities, Martin, Dyrvik, Corcoran, Moody's, and S&P's parent company in the United States District Court for the District of New Jersey. "On March 29, 2010, in the course of the usual monitoring of its investment portfolio," the Operating Engineers "learned of significant losses to the value of the Certificates" and "the existence of potential claims." App. at 464 ¶ 193. Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), the Operating Engineers petitioned to be appointed as Lead Plaintiff, and the District Court granted their request on October 18, 2010.

The Operating Engineers then retained a consultant to research potential claims, "result[ing] in the substantive allegations set forth" in the Amended Complaint, which was filed on December 13, 2010. App. at 464 ¶ 194. The Amended Complaint dropped the claims against Moody's and S&P's, but added claims against UBS Americas, the MASTR Trust, and Slagowitz. UBS moved to dismiss the Amended

---

[3] Because February 20, 2010 fell on a Saturday, one year from the date Moody's downgraded the rating of the Certificates includes Monday, February 22, 2010 for statute-of-limitations purposes. *See* Fed. R. Civ. P. 6(a)(1)(C).

9

Complaint for failure to state a claim on which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), arguing that the Operating Engineers had failed to plead compliance with Section 13 of the Securities Act. The District Court agreed with UBS and dismissed the Amended Complaint without prejudice for the Operating Engineers to re-plead compliance with the statute of limitations.

The Operating Engineers finally filed the Second Amended Complaint, which dropped the claims against the MASTR Trust and added ten paragraphs alleging compliance with the statute of limitations. *See* App. at 461 ¶ 187 - 465 ¶ 196. UBS moved to dismiss the Second Amended Complaint on the basis that the Securities Act claims were untimely. The District Court, applying an inquiry notice standard, determined that the claims were untimely under Section 13 and dismissed the Second Amended Complaint with prejudice. The Operating Engineers timely appealed.

II.

The District Court had jurisdiction over this case under 15 U.S.C. § 77v(a) and 28 U.S.C. § 1331. We have jurisdiction over this appeal under 15 U.S.C. § 77v(a) and 28 U.S.C. § 1291.

We exercise plenary review over a district court's dismissal of a claim as untimely under a statute of limitations, *In re Merck & Co. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 160 (3d Cir. 2008), and for failure to state a claim under Rule 12(b)(6), *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (*en banc*). We must accept all well-pleaded factual

allegations in the complaint as true and view them in the light most favorable to the plaintiff, but "we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Id.* (quotation omitted). Pursuant to these principles, we may only dismiss claims that "lack facial plausibility." *Id.* (quotation omitted).

III.

Both the Amended Complaint and the Second Amended Complaint asserted claims under Sections 11, 12(a)(2), and 15 of the Securities Act. Section 11 "concerns material misstatements or omissions in registration statements;" Section 12(a)(2) "concerns material misrepresentations in prospectuses and other solicitation materials;" and Section 15 "provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269, 284 (3d Cir. 2006) (citations omitted). All three provisions are governed by the same statute of limitations, *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216 (3d Cir. 2007), which is set forth in Section 13 of the Securities Act, and which requires actions to be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," 15 U.S.C. § 77m.

On appeal, the Operating Engineers raise two claims of error. First, the Operating Engineers assert that the District Court erred in dismissing the Amended Complaint because they should not have been required to plead compliance with

11

the statute of limitations. Second, the Operating Engineers contend that the District Court erred in dismissing the Second Amended Complaint because the timeliness of Securities Act claims under Section 13 should be evaluated under a discovery standard, not an inquiry notice standard, and because the class action claims in the Original Complaint would be timely under such a standard.[4] We address these arguments below.

A.

The Operating Engineers first argue that the District Court erred in requiring them to plead compliance with the statute of limitations. UBS responds that this issue is outside the scope of this appeal, and that, regardless, the Operating Engineers are incorrect on the merits. We conclude that this issue is within the scope of this appeal, and we hold that a Securities Act plaintiff is not required to plead compliance with Section 13.

UBS contests our jurisdiction to consider this question because the Operating Engineers' notice of appeal "clearly" references "only" the District Court's order dismissing the Second Amended Complaint. Response Br. at 55. While the

---

[4] The Operating Engineers expressly disclaim any argument that the District Court abused its discretion in dismissing the Second Amended Complaint *with prejudice*. *See* Reply Br. at 25 ("[T]he Operating Engineers d[o] not argue on appeal that the district court should have permitted another opportunity to file an amended complaint.").

12

Operating Engineers' notice of appeal does identify "the Opinion and Order . . . dismissing with prejudice the Second Amended . . . Complaint," it also expressly "encompasses . . . all prior rulings made by the district court." App. at 28. Thus, we disagree with UBS's characterization of the Operating Engineers' notice of appeal.

UBS is correct that "[w]hen an appeal is taken from a specified judgment . . . , the court of appeals acquires thereby no jurisdiction to review other judgments . . . not so specified." Response Br. at 56 (quoting *Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252, 1254 (3d Cir. 1977)). Nonetheless, we "liberally construe[] notices of appeal," *Wiest v. Lynch*, 710 F.3d 121, 127 (3d Cir. 2013) (quotation omitted), and exercise jurisdiction over "other judgments" that are "fairly to be inferred from the notice," *Elfman Motors*, 567 F.2d at 1254 (citations omitted). Thus, under the merger rule, the designated final judgment "draws in question all prior non-final orders and rulings which produced the judgment," *id.* at 1253 (citation omitted), where "(1) there is a connection between the specified and unspecified orders; (2) the intention to appeal the unspecified order is apparent; and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues," *Wiest*, 710 F.3d at 127 (quotation omitted).

Here: (1) the specified order dismissing the Second Amended Complaint and unspecified order dismissing the Amended Complaint concerned Section 13 of the Securities Act; (2) the Operating Engineers' intention to appeal the unspecified order is apparent from the text of their notice of appeal; and (3) UBS has not alleged any prejudice and has

13

fully briefed the issue. Therefore, we have jurisdiction over this issue. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 704-06 (3d Cir. 1996) (exercising appellate jurisdiction over two unspecified prior interlocutory orders dismissing some claims where notice of appeal only specified later final order dismissing other claims).

On the merits, the Operating Engineers challenge the District Court's ruling that they were required to plead with particularity compliance with Section 13 of the Securities Act. The District Court relied on a line of precedent in the District of New Jersey which requires securities plaintiffs to plead with particularity compliance with the applicable statutes of limitations, *Kress v. Hall-Houston Oil Co.*, No. 92-cv-543, 1993 U.S. Dist. LEXIS 6350, at \*5-6 (D.N.J. May 12, 1993), by setting forth "the time and circumstances of the discovery of the fraudulent statement, the reason why discovery was not made earlier, and the diligent efforts plaintiff undertook in making such discovery," *Urbach v. Sayles*, 779 F. Supp. 351, 364 (D.N.J. 1991) (citations omitted). This rule is purportedly necessary because a securities statute of limitations "sets forth . . . a substantive requirement rather than a procedural one." *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 598 (D.N.J. 1996) (citations omitted).

The propriety of this rule is an issue of first impression for us. It is true that we have recognized that "when a statute creating a new cause of action contains in itself a statute of limitations, the limitation imposed becomes an integral part of the right of action created by the statute." *Pa. Co. for Ins. on Lives & Granting Annuities v. Deckert*, 123 F.2d 979, 985 (3d

14

Cir. 1941). Applying this principle, we have held that "Section 12 [of the Securities Act] creates a new cause of action," and that "the provisions of Section 13 [of the Securities Act] are part of and a limitation upon the right of action given by Section 12(2)." *Id.* (citations omitted). Notwithstanding these pronouncements, we have never directly addressed whether a Securities Act plaintiff must plead compliance with Section 13.

Three courts of appeals have historically held that a Securities Act plaintiff must plead compliance with Section 13. *See Davidson v. Wilson*, 973 F.2d 1391 (8th Cir. 1992); *Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420 (10th Cir. 1991), *vacated on other grounds under the name Dennler v. Trippet*, 503 U.S. 978 (1992); *Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir. 1978). The Tenth Circuit provided no justification for this rule. *See Anixter*, 939 F.2d at 1434. The Eighth and First Circuits advanced the same rationale as the District Court. *See Davidson*, 973 F.2d at 1402 n.8 ("[T]he timeliness requirement is substantive."); *see also Cook*, 573 F.2d at 695 ("[W]hen the very statute which creates the cause of action also contains a limitation period, the statute of limitations not only bars the remedy but also destroys the liability." (quotation omitted)).

In contrast, three other courts of appeals have recently held that a plaintiff need not plead compliance with the statute of limitations in the Securities Exchange Act of 1934, which, as we discuss below, is similar to the statute of limitations in the Securities Act. *See Johnson v. Aljian*, 490 F.3d 778 (9th Cir. 2007); *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840 (11th Cir. 2004), *abrogated on other grounds*

15

*by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717 (7th Cir. 1993), *abrogated on other grounds by Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010).  In *Tregenza*, the Seventh Circuit noted that the Eighth, Tenth, and First Circuits relied on "the archaic rule that in the case of common law claims the statute of limitations merely limits the remedy, while in the case of statutory claims it limits or defines the substantive right."  12 F.3d at 719 (citation omitted).  But the court rejected this theory as "a conclusion rather than an explanation," that was "especially dubious" because "the statute of limitations isn't even found in the statute that creates the substantive right." *Id.*  The court also observed that secondary sources suggested "that statutory claims are disfavored," and "that because tolling principles do not apply to statutes of limitations governing statutory claims, it is efficient to permit judges to dispose of untimely statutory claims" at the motion to dismiss stage.  *Id.*  However, the court dismissed both of these reasons as "certainly false today."  *Id.*  Because the old rule "persisted . . . by blind inertia," and "ma[de] no sense," the court concluded, albeit in *dicta*, that it was "time that it was discarded."  *Id.* at 718-19.

In *La Grasta*, the Eleventh Circuit followed the Seventh Circuit's recommendation in *Tregenza*.  358 F.3d at 845.  And in *Johnson*, the Ninth Circuit acknowledged that it had previously adhered to the old rule for the Securities Act's statute of limitations, but the court refused to extend "such a disapproved pleading rule," which had incurred "forceful" and "justified" criticism, to the Exchange Act's statute of limitations.  490 F.3d at 781 n.13 (citations omitted).  The

16

court also recognized that the PSLRA "may require a plaintiff to plead certain facts with particularity, which may establish that the action is time-barred," but the court nonetheless rejected the possibility that the PSLRA required a different result. *Id.*

We agree with the Seventh Circuit's analysis in *Tregenza*, which is consistent with our statute of limitations precedent. For example, we have ruled, in a Securities Act suit, that "[a] statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint." *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 n.14 (3d Cir. 2006); *see also Tregenza*, 12 F.3d at 718 (same). We have also repeatedly held that because a statute of limitations is an affirmative defense, "the burden of establishing its applicability to a particular claim rests with the defendant." *Drennen v. PNC Bank Nat'l Assoc.*, 622 F.3d 275, 292 (3d Cir. 2010) (quoting *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989)); *see also Tregenza*, 12 F.3d at 718 ("[A] plaintiff is not required to negate an affirmative defense in his complaint." (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Indeed, requiring a plaintiff to plead compliance with a statute of limitations would effectively ensure that a timeliness issue would always appear on the face of a complaint, thereby shifting the burden to the plaintiff to negate the applicability of the affirmative defense. Therefore, we hold that a Securities Act plaintiff need not plead compliance with Section 13.

In a last-ditch argument for affirmance, UBS asserts that the Amended Complaint "facially shows noncompliance

17

with the limitations period and the affirmative defense clearly appears on the face of the pleading." Response Br. at 56 (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)). The problem, of course, is that the District Court dismissed the Amended Complaint for precisely the opposite reason – the Operating Engineers' failure to plead any particularized facts related to the timeliness of the claims. Nonetheless, UBS is correct that, in ruling on a motion to dismiss, we may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Id.* (quoting *Oshiver*, 38 F.3d at 1384 n.2). Because, as we discuss below, matters of public record and items appearing in the record of the case reveal that the claims in the Original Complaint were untimely, we will not reverse the District Court's erroneous dismissal of the Amended Complaint.

B.

The Operating Engineers next argue that the District Court erred in applying an inquiry notice standard and in determining that the claims in the Original Complaint were untimely. UBS counters that the District Court correctly refused to adopt a discovery standard, and that, in any event, the claims in the Original Complaint were also untimely under that standard. Although we hold that a discovery standard governs Section 13 of the Securities Act, we conclude that the claims in the Original Complaint were untimely.

18

1.

We first consider whether the District Court erred in applying an inquiry notice standard to determine whether the Securities Act claims in the Original Complaint were timely under Section 13 pursuant to our decision in *Benak*. There, we held that "to the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations." 435 F.3d at 400 (quotation omitted). We explained that under the inquiry notice standard, statutes of limitations start to run when plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim[s] against the defendant[s]." *Id.* (quotation omitted). Whether reasonably diligent plaintiffs should have discovered the basis for their claims, in turn, depends on "whether they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Id.* (quotation omitted). And whether information is sufficient to excite storm warnings depends on "whether a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." *Id.* (quotation omitted). Importantly, a reasonably diligent plaintiff is on inquiry notice when she would have discovered general facts about the fraudulent scheme by the defendant rather than specific facts about the fraud perpetrated on her. *Id.*

If defendants carry their burden of establishing the existence of storm warnings, then "the burden shifts to the plaintiffs to show that they exercised reasonable due diligence

19

and yet were unable to discover their injuries." *Id.* (quotation omitted). Plaintiffs on inquiry notice have "a duty to exercise reasonable diligence to uncover the basis for their claims." *Id.* at 401 (quotation omitted). If plaintiffs cannot demonstrate the requisite diligence, then they "are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." *Id.* (quotation omitted). Plaintiffs may not excuse their failure to inquire merely because "reasonable diligence would not have uncovered their injury." *Id.* (quotation omitted).

In applying this standard, the District Court refused to extend the Supreme Court's holding in *Merck* that a discovery standard applies to the Exchange Act's statute of limitations. 130 S. Ct. at 1798. The court reasoned that the discovery standard "applied to a securities fraud action under [the Exchange Act], and not to . . . claims under the Securities Act," and that "while some other Circuits have adopted the *Merck* standard for [Securities Act] claims, the Third Circuit has yet to do so." App. at 19 n.5. *Merck*'s impact on *Benak* is another issue of first impression for us.

In *Merck*, the Supreme Court affirmed our reversal of the district court's dismissal of securities claims as untimely, but rejected and replaced our inquiry notice standard with a discovery standard. *Merck* concerned the Exchange Act's statute of limitations, which provides that a claim involving "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than . . . 2 years after the discovery of the facts constituting the violation," 130 S. Ct. at 1790

20

(quoting 28 U.S.C. § 1658(b)(1)). Because "the word 'discovery' is often used as a term of art in connection with the 'discovery rule'" in statutes of limitations, the Court first adopted a discovery standard, holding that an Exchange Act claim accrues "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' – whichever comes first." *Id.* at 1789-90, 1793.

The Court next rejected the inquiry notice standard, which it understood to refer "to the point where the facts would lead a reasonably diligent plaintiff to investigate further," *id.* at 1797, as the statute of limitations trigger, even when "the actual plaintiff fails to undertake an investigation once placed on 'inquiry notice,'" *id.* at 1798. The Court explained that inquiry notice "is not necessarily the point at which the plaintiff would already have discovered . . . 'facts constituting the violation.'" *Id.* at 1797. For this reason, the inquiry notice standard conflicts with the text of the statute, which "says that the plaintiff's claim accrues only after the 'discovery' of [the facts constituting the violation]," and "contains no indication that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have *begun* investigating." *Id.* Thus, the Court held that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period." *Id.* at 1798.

We agree with the Operating Engineers that the discovery standard announced by the Supreme Court in *Merck* applies not only to the Exchange Act's statute of limitations, but also to the Securities Act's statute of

21

limitations. Importantly, both statutes incorporate the word "discovery," which the *Merck* Court identified as a term of art representing the discovery rule. *Compare* 28 U.S.C. § 1658(b)(1) ("[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than . . . 2 years after the *discovery* of the facts constituting the violation." (emphasis added))*, with* 15 U.S.C. § 77m ("No action shall be maintained to enforce any liability created under [the Securities Act] unless brought within one year after the *discovery* of the untrue statement or the omission, or after such discovery should have been made by the exercise of due diligence." (emphasis added)). Neither statute includes any language suggesting that the limitations period begins to run before discovery. *Cf. Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013) (declining to graft the discovery rule onto 28 U.S.C. § 2462 because "the most natural reading" of that statute of limitations, which expressly referenced "accrual" not "discovery," was that the "clock begins to tick [] when a defendant's allegedly fraudulent conduct occurs").

Moreover, the *Merck* Court pointed out that the Exchange Act's statute of limitations is indirectly based on the Securities Act's statute of limitations. 130 S. Ct. at 1794-96. Indeed, the Exchange Act's statute of limitations repeats the language of the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991). That decision, in turn, looked to the Securities Act's statute of limitations, among others. *Id.* at 360 & n.7.

22

Furthermore, both the Supreme Court and this Court have treated as interchangeable precedent dealing with the different statutes of limitations. For example, immediately before rejecting the inquiry notice standard for Exchange Act claims, the *Merck* Court defined that standard by citing three court of appeals cases that dealt with Securities Act claims. *See* 130 S. Ct. at 1797 (citing, *inter alia*, *Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002); *Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)). Similarly, in *Benak*, we first described and applied the inquiry notice standard to claims under the Securities Act, 435 F.3d at 400-03, and in *Merck*, we then adopted and applied the *Benak* inquiry notice standard to claims under the Exchange Act, 543 F.3d at 160-72.

UBS attempts to distinguish *Merck* on the basis that the Exchange Act's statute of limitations deals with "claim[s] of fraud," 28 U.S.C. § 1658(b), and that fraud "is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2)" of the Securities Act, *Suprema Specialties*, 438 F.3d at 270 (citation omitted). UBS's reasoning is incorrect. The Supreme Court has repeatedly made clear that the critical inquiry is whether the statutory language incorporates the discovery rule, not whether the underlying claim sounds in fraud. *See*, *e.g.*, *Merck*, 130 S. Ct. at 1794 (explaining that "[l]egislatures have codified the discovery rule in various contexts" other than fraud (citations omitted)); *Gabelli*, 133 S. Ct. at 1224 (declining to apply the discovery rule to fraud claims under

23

the Investment Advisers Act of 1940 due, in part, to the lack of textual support in the general statute of limitations for civil penalty actions). And, in any event, we have indicated that while fraud is not an essential element of Securities Act claims, such claims "can be, and often are, predicated on allegations of fraud." *Suprema Specialties*, 438 F.3d at 270 (citation omitted).

UBS also asserts that the Second Circuit has "concluded that *Merck* applies only to securities fraud claims arising under the Exchange Act, and *not* to non-fraud Securities Act claims." Response Br. at 36 (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 149-50 (2d Cir. 2012)). But UBS overstates the Second Circuit's holding. In *Koch*, to distinguish the Racketeer Influenced and Corrupt Organizations Act ("RICO") statute of limitations, the court stated that "[n]othing in *Merck*'s discussion of [28 U.S.C.] § 1658(b) purports . . . to apply [the discovery standard] outside the context of the statute at issue in that case." 669 F.3d at 149. However, the RICO statute of limitations is "silent on the issue" of accrual, and for this reason, the general discovery accrual rule applies to a RICO claim, whereby the "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Id.* (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). In contrast, *Merck* "involved a statutory exception to the common law rule" because the Exchange Act statute of limitations "was not silent, but rather stated that discovery of the facts constituting the 'violation' lead to accrual." *Id.* Because the Securities Act statute of limitations is also expressly contingent on the discovery of the facts constituting

24

the violation, namely, "the discovery of the untrue statement or the omission," 15 U.S.C. § 77m, *Koch* is distinguishable. Therefore, pursuant to the Supreme Court's decision in *Merck*, we hold that the discovery standard governs whether Securities Act claims are timely under Section 13.[5]

Regarding the amount of information a reasonably diligent plaintiff must have about a particular fact before she is deemed to have "discovered" it under the new standard, we agree with the Second Circuit's analysis in *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d Cir. 2011). As the *MBIA* court pointed out, the *Merck* Court "specifically referenced pleading requirements when discussing the limitations trigger." *Id.* at 175 (citing *Merck*, 130 S. Ct. at 1796). Also, it is logical to link the statute of limitations standard with the pleading standard; the purpose of statutes of limitations is to prevent stale claims, but claims cannot be stale until they have accrued, and claims cannot accrue until they can be adequately pled. *Id.* Thus, we adopt the *MBIA* court's holding that "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.*

---

[5] Although this panel lacks the authority to overrule a binding precedential opinion of a prior panel, we may reevaluate our precedent in light of an intervening Supreme Court decision. *Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 n.50 (3d Cir. 2009).

Despite our holding that the inquiry notice standard no longer governs the statute of limitations under Section 13 for Securities Act claims, we disagree with the Operating Engineers' recommendation that we discard *Benak* and its progeny. The *Merck* Court clearly preserved a limited role for the old standard, acknowledging that "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." 130 S. Ct. at 1798. This information may be helpful because the "limitations period puts plaintiffs who fail to investigate once on 'inquiry notice' at a disadvantage because it lapses [a certain time] after a reasonably diligent plaintiff would have discovered the necessary facts," and a "plaintiff who fails entirely to investigate or delays investigating may well not have discovered those facts by that time." *Id.* (citation omitted). However, we caution that the inquiry notice standard can only play a supporting role because "the limitations period does not begin to run until the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.*

We also disagree with UBS's suggestion that because Section 11 and Section 12(a)(2) claims do not include a scienter element, there is no practical difference between the discovery standard and the inquiry notice standard for Securities Act claims. On the one hand, the two standards will not automatically yield the same result for Securities Act claims. *See id.* at 1797 ("[T]he point where the facts would

26

lead a reasonably diligent plaintiff to investigate further . . . *is not necessarily* the point at which the plaintiff would already have discovered facts showing scienter *or other 'facts constituting the violation*.'" (emphasis added)). On the other hand, the difference between the two standards will normally fluctuate in tandem with the level of specificity of the information about a fact that is available to a reasonably diligent plaintiff. *See id.* at 1798 ("[A] reasonably diligent investigation . . . may consume as little as a few days or as much as a few years." (quotation omitted)); *MBIA*, 637 F.3d at 175 ("[T]he amount of particularity and detail a plaintiff must know before having 'discovered' the fact will depend on the nature of the fact."). Thus, if the information is generalized, – *i.e.*, does not refer to a specific security or defendant – then there will typically be a larger temporal disparity between the start of the investigation and the discovery of the facts constituting the violation. But if the information is particularized, – *i.e.*, does refers to a specific security or defendant – then there will usually be a smaller temporal disparity between the start of the investigation and the discovery of the facts constituting the violation.

2.

We next decide whether the District Court erred in determining that the claims in the Original Complaint were untimely. The court rejected the Operating Engineers' argument that general storm warnings referencing Countrywide and IndyMac "were not specific enough to place [a reasonably diligent plaintiff] on inquiry notice" because they did not reference UBS, the Certificates, or the Offering Documents. App. at 22. Instead, in light of the "sheer

27

volume of reports, articles, and lawsuits concerning the mortgage lending industry and [mortgage-backed securities] available prior to February of 2009," the court opined that "a reasonable investor of ordinary intelligence would not need to know the details of the specific loans that comprised their certificates in order to trigger an investigation."[6] *Id.* at 24.

On appeal, the Operating Engineers admit that there were storm warnings about Countrywide and IndyMac more than a year before the Original Complaint was filed, Reply

---

[6] The District Court also determined that, even if it were true that a reasonably diligent plaintiff "could not have discovered the facts underlying [her] claims until after February 20, 2009, when the ratings agencies Moody's and S&P downgraded the . . . Certificates," App. at 22, the Operating Engineers had not demonstrated reasonable diligence because they admitted "that [they] did not learn of significant losses to the value of [their] Certificates until March 29, 2010, over a year after the Certificates' ratings were downgraded," *id.* at 24 (citing *id.* at 464 ¶ 193). Under the discovery standard, the statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discovered the facts constituting the violation' – *whichever comes first.*" *Merck*, 130 S. Ct. at 1798 (emphasis added). Because we conclude, as discussed below, that a reasonably diligent plaintiff would have discovered the untrue statements or the omissions more than a year before the Original Complaint was filed, the fact that the Operating Engineers did not discover their claims until more than a year following the Moody's downgrade is irrelevant.

28

Br. at 19 ("Beginning as early as August 2006, numerous lawsuits, governmental investigations, and press reports revealed significant misconduct at numerous mortgage loan originators, such as Countrywide and IndyMac, concerning various mortgage loan underwriting practices."),[7] and that the Offering Documents indicated that Countrywide and IndyMac collectively originated about 92% of the loans underlying the Certificates, App. at 1596. But based on *Merck* and *MBIA*, the Operating Engineers argue that because a reasonably diligent plaintiff does not discover a fact constituting a violation until she can state a plausible claim about her particular security, the storm warnings must be certificate-specific. We disagree.

---

[7] In determining that the claims in the Original Complaint were untimely, the District Court relied, in part, on an "August 2006 class action suit against IndyMac . . . [that] alleged [a] 'systematic and continued failure to provide independent and effective appraisals and evaluations,' which caused damage to [mortgage-backed securities] holders." App. at 21 (citation omitted). The District Court's consideration of storm warnings that pre-dated the Operating Engineers' purchase of the Certificates on September 18, 2007 was error. *See MBIA*, 637 F.3d at 176 ("[I]f the statute of limitations cannot begin to run until a claim has accrued, and a securities fraud claim does not accrue until the plaintiff has bought or sold the relevant security, then the statute of limitations cannot begin to run until after the plaintiff's transaction.").

29

As discussed above, the *Merck* Court preserved a limited role for inquiry notice in a statute of limitations analysis. 130 S. Ct. at 1797-98. Thus, we look to our pre-*Merck* precedent, which instructs that a reasonably diligent plaintiff would undertake an investigation based on "[t]he filing of related lawsuits," "news articles and analyst's reports," and "prospectuses, quarterly reports, and other information related to their investments," *Benak*, 435 F.3d at 400, 403 n.20 (quotations omitted), even when the information therein is not "company-specific" or security-specific, *DeBenedictis*, 492 F.3d at 217. Nonetheless, the *Merck* Court ultimately rejected the inquiry notice standard as the trigger for the statute of limitations. 130 S. Ct. at 1797-98. Thus, while a reasonably diligent plaintiff would have started an investigation based on these non-security-specific storm warnings, the statute of limitations would not have begun to run until she discovered the untrue statements or the omissions concerning her particular Certificates.

The Operating Engineers next contend that a reasonably diligent plaintiff would not have discovered the untrue statements or the omissions regarding the Certificates until the rating downgrade by Moody's on February 20, 2009 because UBS made two reassuring, specific statements about the Certificates that dissipated the general storm warnings about Countrywide and IndyMac. First, on September 18, 2007, when the Operating Engineers purchased the Certificates, the Offering Documents reassured that there were "no material legal proceedings currently pending against any of [UBS Real Estate], [MASTR] or the [MASTR Trust]." App. at 1728. Second, on March 31, 2008, MASTR filed a

30

public SEC Form 10-K reassuring that MASTR "kn[ew] of no material pending legal proceedings involving [Countrywide or IndyMac], other than routine litigation incidental to the duties" of those companies."[8]  Reply Br. at 18 (quotation omitted).

We have recognized that "reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *Merck*, 543 F.3d at 168 n.14.  Here, we agree that, despite widely-publicized reports about widespread problems with underwriting standards at Countrywide and Indy-Mac, an investor of ordinary intelligence would reasonably rely on UBS's reassurances that the particular loans underlying its specific Certificates were not afflicted with the common ailment.  Thus, as of

---

[8] UBS argues that we should not take judicial notice of the Form 10-K, which the Operating Engineers failed to produce before the District Court or in their Opening Brief.  In *Oran v. Stafford*, we took judicial notice of a public SEC filing, which had not been presented to the district court, but which had been referenced in the opening brief, concluding that there was "no risk of unfair prejudice or surprise."  226 F.3d 275, 289 (3d Cir. 2000) (citation omitted).  Here, while the Operating Engineers waited to reference the document until their Reply Brief, we conclude that there is no danger of unfair prejudice or surprise since we have carefully considered UBS's eight-page motion addressing the document, and since UBS itself filed the document with the SEC.  Thus, we will take judicial notice of the Form 10-K.

March 31, 2008, a reasonably diligent plaintiff would not have inquired about potential claims related to the Certificates.

However, we conclude that by September 9, 2008, a reasonably diligent plaintiff would have begun investigating his Certificates. The record reflects that on that date, a class of plaintiffs – including the Operating Engineers – filed an amended class action complaint in the California Superior Court against both Countrywide and UBS Securities, asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act that were substantially similar to those in this case. That complaint specifically alleged that Countrywide was the "originator of the majority of the underlying mortgages supporting the securitization transactions," and that UBS Securities "drafted and disseminated the offering documents for the Certificates," and "issued false and misleading Prospectuses in connection therewith." App. at 1296 ¶ 19, 1298-99 ¶ 29. In particular, the "Prospectus Supplements" were "false and misleading" because they contained "omissions and misrepresentations" related to "the underwriting process for the mortgages," including "creditworthiness of borrowers, debt-to-income levels and loan-to-value ratios." *Id.* at 1320 ¶ 59.

A reasonably diligent plaintiff who had purchased mortgage-backed securities from UBS Securities based on loans that were largely originated by Countrywide would have noticed that complaint. *Benak*, 435 F.3d at 403 n.20. The allegations in the complaint, which suggest that UBS Securities could not be trusted to verify Countrywide's underwriting standards for the loans underlying the securities

32

it sold, would have undermined UBS's prior reassurances about the Certificates. Thus, a reasonably diligent plaintiff would have begun to inquire about her Certificates by September 9, 2008.

Because UBS has established the existence of storm warnings, we must evaluate whether a reasonably diligent plaintiff who began investigating in September 2008 would have discovered the untrue statements or the omissions about the Certificates in the Offering Documents before February 2009. The Operating Engineers claim that no reasonably diligent plaintiff would have discovered the facts underlying their claims because "[t]he mortgage loan files for the borrowers whose mortgage loans were included in the mortgage pools underlying the Certificates have never been available to investors." App. at 461 ¶ 187. The Operating Engineers admit that UBS made available certain loan-level data about the underlying mortgages in March 2007 and June 2008. *Id.* at 461 ¶ 188. But the Operating Engineers allege that the information was inadequate to enable them to discover their claims because it did not include "specific borrower's names and addresses," and so did not allow them to "determine whether the loans satisfied the represented loan criteria, including such important and material data points as [loan-to-value] and [debt-to-income ratios]." *Id.* at 462 ¶ 189.

According to the Operating Engineers, they acted as a reasonably diligent plaintiff with respect to the Certificates at all times. *Id.* at 463-64 ¶ 192. In particular, the Operating Engineers aver that they retained a consultant to investigate their potential claims after they were appointed Lead Plaintiff on October 19, 2010. *Id.* at 464 ¶ 194. The consultant "used

33

a proprietary process" that involved "combing through court filings and numerous databases" in order to "uncover financial information for certain of the individual borrowers of the loans underlying the Certificates in order to back test the accuracy of the [debt-to-income], occupancy and [loan-to-value] ratios disclosed by [UBS]." *Id.* Based on this investigation, the consultant constructed the substantive allegations in the Amended Complaint,[9] which was filed on December 13, 2010. *Id.* In other words, by the Operating Engineers' own timeline, their reasonably diligent investigation took about two months to uncover the facts underlying their claims in 2010.

The question then becomes whether a comparable investigation would have been equally successful in September 2008. The Operating Engineers respond in the negative because the consultant could not have "solely [used] the limited loan-level data" made available by UBS in March 2007 and June 2008. *Id.* at 464-65 ¶ 195. We conclude that a

---

[9] The Operating Engineers actually alleged, in the Second Amended Complaint, that their consultant's investigation "resulted in the substantive allegations set forth [t]herein." App. at 464 ¶ 194. However, this admission also applies to the Amended Complaint. As the District Court explained, the difference between the Second Amended Complaint and the Amended Complaint is that the former added ten paragraphs about the statute of limitations (not about the underlying substantive allegations) to the latter. *Id.* at 15. Thus, the consultant's investigation resulted in the substantive allegations set forth in the Amended Complaint.

reasonably diligent plaintiff's investigation would have been no less fruitful in 2008 than in 2010.

Although the Operating Engineers do not elaborate, the consultant's "proprietary process" apparently involved an analysis of "court filings." *Id.* at 464 ¶ 194. Rather than the court filings – such as the complaint filed in California Superior Court in September 2008 – that gave rise to the storm warnings, it seems as though the consultant sought out court filings related to bankruptcy or foreclosure proceedings on the loans underlying the Certificates. *See id.* ("This 'reverse-engineering' process included combing through court filings . . . to uncover financial information *for certain of the individual borrowers of the loans underlying the Certificates.*"). As early as June 2008, UBS disclosed that about 12.5% of the loans underlying the Certificates were tied up in either bankruptcy or foreclosure proceedings. *Id.* at 461 ¶ 188, 2018. Thus, in 2008, the consultant would have known of these cases and would have used them to back engineer the actual debt-to-income and loan-to-value ratios for the borrowers in bankruptcy or foreclosure proceedings.

The consultant's "proprietary process" also apparently involved an analysis of "numerous databases." *Id.* at 464 ¶ 194. If, as the Operating Engineers allege, the consultant's investigation were reasonably diligent, it would have included a review of the SEC's databases. *Benak*, 435 F.3d at 400. In March 2007, UBS publicly filed a Free Writing Prospectus pursuant to SEC Rule 433 that set forth granular loan-level details, including purported debt-to-income and loan-to-value ratios as well as occupancy rates for the underlying

35

mortgages.[10]  *Id.* at 1526-38.  Thus, in 2008, the consultant would have compared the actual debt-to-income and loan-to-value ratios gleaned from bankruptcy and foreclosure proceedings with UBS's represented values, thereby discovering the facts underlying the Operating Engineers' claims.

For these reasons, we conclude that a reasonably diligent investigation would have yielded the same results in both 2008 and 2010.  Thus, a reasonably diligent plaintiff would have discovered the untrue statements or the omissions about the Certificates in the Offering Documents in November 2008, two months after she was alerted by the complaint filed in California Superior Court in  September 2008 to the possibility that she might have claims.  Because a reasonably diligent plaintiff would have been able to plead viable Securities Act claims in November 2008, the Section 13 statute of limitations would have run, at the latest, in November 2009.  Therefore, the Original Complaint, which was not filed until February 2010, was untimely.

---

[10] It would be inappropriate to consider UBS's March 2007 SEC filing as a storm warning, since the Operating Engineers did not purchase their Certificates until September 2007.  *See MBIA*, 637 F.3d at 176.  Nonetheless, it stands to reason that once a plaintiff is on inquiry notice, a reasonably diligent investigation would uncover information that pre-dates her purchase of her securities.

## IV.

In sum, we hold that a Securities Act plaintiff need not plead compliance with Section 13, and that the timeliness of Securities Act claims under Sections 11, 12(a)(2), and 15 should be measured against a discovery standard. We conclude, however, that the claims in the Original Complaint were untimely. Therefore, we will affirm the District Court's order dismissing the Second Amended Complaint with prejudice.